No. 28,834.

THE STATE OF KANSAS, *Appellee*, v. EMMITT (J. E.) BYRD, *Appellant*.

(288 Pac. 551.)

Opinion filed June 7, 1930.

*F. S. Macy*, of Liberal, *W. E. Eddy*, of Hugoton, *Thomas F. Doran, Clayton E. Kline, Harry W. Colmery* and *M. F. Cosgrove*, all of Topeka, for the appellant.

*William A. Smith*, attorney-general, *R. O. Mason*, assistant attorney-general, and *Oscar F. Perkins*, county attorney, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Emmitt Byrd was charged in Morton county with the larceny of a cow, the property of Wade Benton. He was tried and found guilty. He has appealed, and contends: (1) that the evidence is insufficient to sustain the verdict; (2) that the venue of the crime was not proved, as alleged; (3) that the court erred in refusing requested instructions, and in the instructions given.

The facts disclosed by the record may be stated as follows: Emmitt Byrd lived at Hugoton, in Stevens county. He did some farming, but his principal business was buying and selling cattle and other live stock. Perhaps half a mile from the railway stockyards at Hugoton he had his own private stockyards, consisting of several pens, a building for hay, grain, etc., where he received and fed live stock, purchased in the country about, until sold or shipped.

He sometimes received live stock at the railway stockyards. He appears to have borne a good reputation. It was not infrequent for persons from whom he had bought live stock to deliver them at his own or the railway stockyards and leave them, if he was not there— and sometimes he was not—and later settle with him for them. In some of his transactions he operated with C. L. Nix, a farmer who lived twelve miles east of Hugoton, and who, in the fall or winter, dealt in live stock. Sometimes he and Nix would buy together, or would buy separately and ship together. While Byrd's principal place of business was at Hugoton, he sometimes shipped from, or received cattle at, the stockyards at Rolla, a station in Morton county eighteen miles west of Hugoton. Wade Benton was a farmer who lived about six miles east of Richfield, in Morton county (perhaps twenty-five miles west of Hugoton). He had formerly been a butcher, and in the winter time bought and shipped cattle and hogs, and was engaged in that business in November, 1927. His shipments were usually made from Rolla. He and Byrd had been acquainted for several years. In 1925 they had difficulty over some stock, but that appears to have been adjusted, and thereafter they frequently met at stock sales and sometimes traded in live stock with each other. On Thursday, November 17, 1927, Benton was receiving cattle and hogs at the stockyards at Rolla for shipment the next day. Among the stock received were five cows which he had bought from Kenneth Earle, who lived in Texas county, Oklahoma. Earle drove these cows to Rolla and delivered them to Benton at the stockyards there soon after noon, and received pay for them. One of these was a four-year-old yellow Jersey cow with dark markings, dehorned, but the stubs had grown out, one of them longer than the other, with a crop and slit in the right ear. Earle had raised this cow, and when she was a two-year-old had split her tongue for about two or three inches to prevent her sucking. She was a dry cow, but would be fresh about the middle of January. Benton received other cattle and hogs at Rolla that day. Byrd was at Rolla the same day and received three head of cattle which he had purchased and were delivered to him at the stockyards there. One of these was a fat Holstein heifer. Benton saw Byrd at the restaurant at noon. They visited about their live stock, and were together at the stockyards in the afternoon. Benton offered to trade the four-year-old yellow Jersey cow for the Holstein heifer, but no trade was made. Byrd had with him a four-wheeled trailer used to haul live stock, which he pulled with a Ford car. Both Byrd and

Benton went to the country that afternoon, but were together again at the stockyards about five o'clock in the evening, at which time Byrd loaded his three head of cattle in the trailer and started for Hugoton. Benton went about looking after his live stock, and the next morning loaded his car for shipment. At that time he missed this four-year-old yellow Jersey dry cow. Benton did not know what had become of her. At some time in the afternoon of the 17th he had showed her to a neighbor, Mr. Auls, who was not fully decided about buying her. On Saturday evening, the 19th, Benton met Auls and, assuming that he had made up his mind to buy the cow and had taken her intending to pay for her, suggested settlement. But Auls stated that he did not get the cow.

L. C. Rickert, with his team, had been working for the railroad company widening the grade near Hugoton and was camped in the stockyards at Hugoton. When he fed his team about five o'clock the evening of November 17 he noticed that there were no cattle in the stockyards. When he did his feeding the next morning about eight o'clock he saw a yellow Jersey cow with dark markings in the stockyards. The cow stayed there without anyone paying any attention to her, apparently, until the next afternoon, which was Saturday, the 19th, when Rickert met Byrd on the street at Hugoton and asked Byrd if that was his cow in the railway stockyards. Byrd said he didn't know, that some one might have brought her in for him. Rickert told him the cow had been there since Friday morning without anything to eat or drink, and Byrd stated that he would look after her. About ten o'clock that evening, in company with Mack Greenwood, who was at Byrd's yards dealing with him about some cattle, Byrd took some feed to the cow in the railway stockyards. On Sunday morning, November 20, Byrd and Nix shipped two carloads of cattle from the Hugoton yards. They were taken there about 9:30 in the morning to be loaded in time for the eleven o'clock train. There were eighty-one or eighty-two head of cattle in the shipment. This cow was in the stockyards at that time, but was not loaded or shipped. Nix accompanied this shipment to Kansas City and did not return to Hugoton until a week later. On the day the shipment was made Byrd took this cow which had been in the stockyards, also a calf which he or Nix did not want to ship, to his own private stockyards.

On Sunday, November 20, Benton went to Hugoton and drove by Byrd's stockyards and saw a cow in the yards which he thought

was the cow he had bought from Earle, and which he missed on Friday morning from the stockyards at Rolla. He went to the sheriff of Stevens county, Mr. Jones, and he and the sheriff drove by Byrd's yards and saw the cow. Jones suggested he had better get better identification, and Benton drove to Oklahoma and got Earle and brought him to Hugoton, and they and the sheriff again looked at the cow in Byrd's stockyards. Earle was positive it was the cow he had sold to Benton and delivered to Rolla on Thursday, November 17. This examination was made about four o'clock Sunday afternoon. Benton took Earle back to his home in Oklahoma. On Monday Benton consulted a neighbor, B. B. Long, of Rolla, also Charles H. Drew, a substantial farmer and live-stock man, who lived near and whose family, for school purposes, was living in Hugoton for the winter. He also consulted the county attorney and sheriff of Morton county, and on Monday evening, in company with Charlie Bentley, a deputy sheriff of Morton county, and Drew and Jones, went to Hugoton, arriving there about nine or ten o'clock in the evening. They drove by Byrd's stockyards, looked in one of them with a flashlight, but did not see the cow. They stayed in Hugoton that night, conferred with sheriff Jones, and early Tuesday morning went to Byrd's stockyards. He was not there. In the yard were some hogs and part of the carcass of a cow, also part of a carcass of a horse, which had been mostly eaten by the hogs. The cow had been skinned. The head had been removed, and near where the cow's head should be was the head of the horse. Some witnesses said it was fitted close to the cow, as though placed there by human hands. Other witnesses said it was several feet away. One hind quarter of the cow had been removed and one front quarter. Benton and those with him went to town for breakfast, but returned to Byrd's yards about eight o'clock. At this time Byrd was there, cleaning up about his yards. He had his trailer in the yard and was loading that with manure, straw, etc., to be hauled away. Benton opened the conversation with Byrd by saying: "Hello, Emmitt, what are you doing?" Byrd replied: "I guess I'm stealing cattle; that's what they say I'm doing." Jones then said he had brought the men down there to talk to him. Benton then asked Byrd where his cow was that was in the lot there Sunday. Byrd said he didn't know—that he would like to know where two or three of his were. Byrd was asked about the carcass of the cow in the lot. He said it was that of a lump-jaw cow he had

bought of Pearce (or a Pearce cow). He was asked why he did not ship her, and he said she had died, had got sick when they were taking the cattle to the stockyards, and that he had to bring her back. He was asked what was the matter with her, and he said she got foundered on corn; that some man had brought him a load of corn and in scooping it in the granary several bushels were spilled on the ground. One stomach of the cow in the carcass was examined and found to contain no corn. Byrd then said she must have got foundered on water. He was asked where the other two quarters of the cow were. He said he had taken one of them to his chicken lot and had also taken the other stomach, which was full of corn, to the chickens. Some of the officers went to his chicken lot a few blocks away and there found the one quarter of the cow, but did not find the stomach. That was later found in his trailer covered with manure and straw. It was opened and no corn was found in it. He was asked about the other quarter and the hide. Byrd said Nix had an interest in the cow with him and had helped to skin her, and he wasn't sure what was done with the hide, perhaps it was thrown over in the hog chute; that Nix had taken the other quarter home and might have taken the hide. The officers called Nix's residence by telephone. Mrs. Nix said no hide or meat had been brought there. The other quarter was found the next day hanging to the rafters in one of the buildings at Byrd's stockyards. The hide was found under a pile of corn in a granary of his yard. The hide, when found, was that of a yellow Jersey cow with dark markings, and where it had been cut away from near the hoofs in the skinning the notches made by the knife fitted with those still on the hoofs. The head of the cow had been skinned, and near the center of the forehead was a hole, as though made by a bullet. Byrd was asked about the head, and said that he had thrown it over the railway fence and poisoned it to kill dogs that had been bothering. A few days later the head was found perhaps half a mile from Byrd's stockyards on the prairie, where some junk had been thrown. The split tongue was still in the head, and near the center of the forehead was a hole as though made by a bullet. In short, the investigation disclosed clearly that the cow, the carcass of which was in Byrd's stockyards, was that of the cow sold by Earle to Benton and delivered to him at the stockyards at Rolla November 17. The identification was so thorough and complete that it is not now questioned. It was also quite clear that the animal had been shot and

killed, and that Byrd had dismembered the carcass and tried to secrete portions of it. Many of the statements he made to the officers, only some of which have been noted, were demonstrated to be false.

On Tuesday, November 22, L. C. Rickert observed, at a place near the railway stockyards at Hugoton, the tracks of a trailer, and near that a place on the ground where a cow had been pushed out and slipped on the ground. The car and trailer tracks were clearly visible. He examined them; it was a four-wheeled trailer and appeared to have two new tires on the rear and two smooth-tread tires in front. He examined the treads of the new tires and compared them with the tires on Byrd's trailer. That had two smooth tires in front and two new tires in the rear. The marks in the track compared with the tread on these new tires and were the same. Later, but before the trial, Byrd, in talking with Rickert, said he understood Rickert had seen the person bring the cow to the stockyards. Rickert told him, no, he didn't see the cow brought there, but he did see the tracks of the trailer, and asked Byrd if some one had his trailer that night. Byrd said if anyone had it he didn't know it.

The evidence disclosed that after Byrd left the stockyards at Rolla, about five o'clock Thursday evening, November 17, he ate supper at a restaurant at Hugoton and visited with two persons there about seven o'clock in the evening. About ten o'clock, or later, that evening Ralph Haight, a farmer who lived in the country, called Byrd by telephone at his residence in Hugoton and talked with him. On that day Nix had been threshing, and after supper he went to town to see Byrd about their shipping cattle. His son was with him. They drove directly to Byrd's residence, but did not find him, although a light in the house was burning. They went up town and looked for Byrd about the streets and in various places, but did not find him, and went back to his house, where they found the light still burning, but no one was there. They then drove home, reaching home at ten o'clock in the evening.

In the above summary of the evidence it has not been possible, of course, to give all the details. While argued under the headings as stated early in this opinion, appellant's real contention may be stated thus: There is no evidence in the record as to how this cow got out of the stockyards at Rolla and into the railway stockyards

at Hugoton, or who took her out of the Rolla stockyards, or drove or transported her to Hugoton; and if it can be said that the evidence establishes that after the cow was in Byrd's stockyards at Hugoton she was shot in the head and killed, and that Byrd dismembered the body and secreted various parts of it, these facts would not establish that Byrd stole the cow from the stockyards at Rolla, in Morton county.

The court gave a well-worded instruction on the inference of guilt of larceny which the jury might draw from the recent unexplained possession of stolen property. Appellant complains of this instruction and argues that it is only the recent *unexplained* possession of stolen property from which guilt of larceny may be inferred, citing *State v. McKinney,* 76 Kan. 419, 91 Pac. 1068; and it is argued that while Byrd himself did not take the witness stand and give any explanation of his possession of the cow, the evidence as to how he got possession of the cow was produced by the state when it was shown by the testimony of Rickert that the cow was in the railway stockyards at Hugoton from Friday morning until Saturday evening, with no one, apparently, paying any attention to her, Rickert's telling Byrd on Saturday afternoon of the cow's being there. That testimony was, of course, a circumstance favorable to defendant, but it was competent to show defendant's possession of the cow, the circumstances, so far as the state knew them, of how he obtained possession, and the evidence as to what Byrd did with the cow when she was in his possession, and all of the facts and circumstances disclosed by the evidence in connection therewith. In this connection appellant complains of the testimony of Rickert with respect to the tracks of the trailer near the stockyards, and points out that these were not observed by Rickert until the Tuesday after the disappearance of the cow Thursday night, and argues that, at most, a trailer similar to Byrd's trailer had been there at the stockyards at some time recently before the Tuesday when the tracks were found, and that a cow brute of some kind had been unloaded from it. It is true the evidence is remote as to time, but it was competent, and its weight was for the jury. In view of the disposition made of the cow by defendant, and of all the other facts shown, we think it was proper for the court to give the instruction just referred to. (*State v. Rice,* 93 Kan. 589, 144 Pac. 1016; *State v. Bell,* 109 Kan. 767, 201 Pac. 1110; *State v. Schaefer,* 111 Kan.

153, 204 Pac. 765.) The instruction being proper, there is no lack of evidence to sustain the verdict. This also disposes of the second question raised by appellant, namely, that the venue was not established, for, if the evidence was sufficient to sustain the verdict of larceny, and it was disclosed that the larceny occurred in Morton county, that also establishes the venue to be in Morton county. (See *State v. Shanahan,* 114 Kan. 212, 217 Pac. 309.)

In view of the defendant's statements to the officers that Nix and he owned the cow together, that Nix had helped skin her, and had done something with the hide and with a quarter of the meat, and of the testimony tending to show that defendant's trailer delivered the cow to the railway stockyards at Hugoton—without evidence as to who was in charge of the trailer at that time—and in view of the other facts and circumstances disclosed by the evidence, the court gave instructions embodying the law as to an accessory to a felony before the fact (R. S. 62-1016), which instructions followed quite closely and, so far as they are pertinent, those given in *State v. Wolkow,* 110 Kan. 722, 205 Pac. 639. Appellant complains of these instructions on the ground that there was no evidence in the case which would justify the submission of instructions of this character to the jury. This contention cannot be sustained. While the evidence on this branch of the case is not so voluminous as it is in some cases, from the statement of the evidence above made it is clear that there was evidence which authorized the giving of these instructions.

Finding no error in the record, the judgment of the court below is affirmed.